Before we start the talk, I'd like to ask Mr. Rosenquist, we have this show-cause order and this issue about the confidentiality markings, and we've had a couple of letters from you. Could you stand? I think we just have a couple of questions for you. I'm John Rosenquist, your honor. Who did the confidentiality markings in these briefs? Myself and my associate. Quite honestly, not to interrupt you, they were basically based on our understanding of what was Gilead confidential under the Discovery Confidentiality Order and their Rule 11 statement. Okay. Are there any other questions, Benson? No. Okay. Why don't we start the argument, Mr. Rosenquist? Your honor, as we say at page 3 of our opening brief, there are actually two issues in this case. The first one is whether the district court applied the correct standard, and she did not. She applied an erroneous standard relative to a 285 motion for attorney's fees. Since her decision, and she relied on the Brooks Furniture case, which required clear and convincing evidence in order for a case to be exceptional under 285, there was a change in the law, octane fitness, and also the Highmark case. But as I read your brief, the reason you think the attorney's fees ought to be awarded is that the position was objectively unreasonable, right? I didn't quite hear that. The reason you think that fees should be awarded here is that the position about experimental use was objectively unreasonable. That's essentially correct, or a better way to say it, it was not a substantively, as you said, reasonable litigation of the case based on the fact that there was a sale of commercial-sized quantities of both Crystalline Antifever Diprovoxyl. If you don't mind, I'll call it AD because I'll mispronounce it. And also tablets containing Crystalline AD years before the critical date of the 340 patent. Well, the argument is that that was experimental use because it was for clinical trials. Absolutely, that is the argument. If you look at the brief... You can't interrupt me. You say that the cases say that the experimental use exception doesn't apply to clinical trials, and yet look at the Eli Lilly case and it seems pretty clear that at least in some circumstances clinical trials can support an experimental use. But I think, I could be mistaken, but I think in that case, what you're telling me about a use, in this case we're talking about a sale. And I think the law is different with respect to sale, and I think the law with respect to sale is governed by this court's decision in C.R. Bard, which is cited in our reply brief. And in that case, and I can actually read from it, I think recorded from it, what they say in that case, and what actually this court said in that case, is the fact that if you have a sale, we're really looking at the second prong of the Faft-Wells case, which is, was it ready for patenting? With respect to a situation where you have a pharmaceutical, and you have a sale of the pharmaceutical, or an offer for sale of the pharmaceutical, and then you have subsequent clinical testing. That clinical testing does not... Are you saying sell because, are you saying, are you using the word sell because they placed an order for the AD? Oh, I was just saying... Or they sold it to third party customers? No. The situation, let me explain a little bit. The situation was as follows. My understanding is that Gilead was not big enough to make enough Crystalline AD, and tablets for Crystalline AD themselves to be able to use in any kind of Phase I, Phase II, or Phase III clinical trial. So what they did is they approached a manufacturer, Raylo, who happened to be in Canada, to sell them commercial size quantities of Crystalline AD, that was the active ingredient. Again, Gilead was not big enough to make the tablets themselves, so they had to out, and actually there was a sale. And I think there was over a million dollars transferred between Gilead and Raylo. So actually the inventor was buying from the manufacturer instead of the inventor selling to somebody else. They went to Quintiles, and Quintiles made tablets for them. And again, they made well over a million dollars worth of tablets. I forget... Do you have any evidence that the tablets were not used in the clinical trials? That they were not used? Correct. They were used. As a matter of fact, if you look at the memo that happens to be on our appendix, and I apologize to the court that I don't remember exactly the appendix number, but it's the memo that is that March 13th, 1996, Adafib or Diproboxyl team meeting minutes. And in there there's no question that they discussed not only the lots of API, Crystalline AD bought from Raylo, but also tablets from Quintiles in that memo in connection with clinical trials. So there's no question they were used in the clinical trials. With respect to getting back to my case... Well, I want to bring you back to see our board. The language that you're relying on is not from the majority opinion, right? No, it is in the majority opinion because that actually... I understand that. It was a very unusual case. Obviously, there are three judges in the Federal Circuit. In this particular decision, it looks like a dissent, but it's not because it's joined by one of the other three judges. So actually, I'm the point... That does not make it a majority opinion. It doesn't make it a majority opinion. All right. Well, then it's not a majority opinion then. But with respect to the law, it makes perfect. I should say perfect sense. But my understanding is that is the law. The law is that subsequent clinical trials, and you're really looking at the second prong of FAFT versus Wells, which is a ready for patenting. Subsequent clinical trials of a invention that is cleaned in a later filed patent don't count as an experimental use. And we actually have another case in there too, which... What evidence do you have that individuals that were prosecuting the patent knew about those minutes or about the purchase? Well, actually, the evidence I have is as follows. Their names are in the memo. The president and CEO, John Martin, is on the memo. He got a copy. The two attorneys who prosecuted the patent application, the 340, it was sent to them. And three of the, and I think it's seven inventors, are also sent the memo. Now, as we mentioned in our brief, once we found this, then we brought in invalidity under 102B for on sale into the case, and eventually we had to fight Gilead's motion to keep it out of the case. But during that entire time, we were seeking the deposition of Mr. Martin to try and take his deposition on exactly the point that I'm making now, which is Gilead knew of sales from Raylo to Gilead and from Quintiles to Gilead of commercial-scale clients. I really am at a loss to understand how you can say that their position was objectively unreasonable. It may be arguable. You may have arguments as to why that was wrong, but to say that it's objectively unreasonable, I'm having difficulty seeing that. Well, if you can point out to me what your problem is there, I'll attempt my trial. My problem is Eli Lilly and the fact that this was for clinical trial. And I don't see that the cases that you're relying on make this distinction between use and sale as you do. And, you know, you can argue about it, you can say that that makes a difference, but to suggest that the law was perfectly clear and that they had no reasonable basis for the argument, I don't get that. Well, Your Honor, as I understand Gilead's position, it is that the use was experimental because they were being used in Phase III clinical trials. And there the argument is they had to wait until the trials were finished to see if, I'll use the word, literally the pills would work. The problem with that argument factually is Gilead filed a 340 patent before the Phase III clinical trials were finished. And so what I'm saying... This is just argument. You haven't established that they were making a frivolous, taking a frivolous position. Well, I understand Your Honor's problem, but what I'm saying is the top executives, the attorneys and the inventors knew of the sales and they knew what was being bought was exactly later on claimed. So, in effect, the first prong of Faft-Wells is satisfied. The second prong, experimental use, this is a sale, Your Honor. It's not a use. It's not a prior public use. And I think that this Court's decisions, including Baird, including Zakarin, are such that when it comes to a sale, an experimental use, subsequent experimental use, this literally doesn't qualify as an experimental use. If we disagree with you on that argument, do you think we can just go ahead and affirm the denial of attorney fees even under the Octane standard, or do we still need to vacate and remand? Well, Your Honor, with respect to affirming, I think we should have been allowed the ability, and I'm getting the yellow light, allowed the ability to take discovery of the people who got the memo, starting with John Martin. So if we go, so you shouldn't affirm, what you should do is reverse and remand. Well, that's not really answering the question I asked, because you're raising new things that I wasn't wanting to talk about. I just want to know, specifically, if we disagree with you on the legal argument that you were just making, is there any reason, and we find that you're wrong, is there any reason for us to send it back to the District Court to reexamine attorney fees? The only reason, Your Honor, is the one that I mentioned, our inability to show that there was knowledge of what was here, and I guess the real answer to your question is, Your Honor, no, you should affirm. Okay, thank you, Mr. Rosenquist. We'll reserve the remainder of your time for rebuttal. Mr. Kelly? Good morning, Your Honor. Your Honor, I'd just like to start, may it please the Court, I'd like to start by referring to the memo that Mr. Rosenquist referred to. It's actually at the appendix A-153, and that memo names 46 people, all right,  five months before the close of discovery. Sigma Farm deposed one person on that memo, and that person was somebody we put forth, Gilead put forth as a 30B6 witness. What's the point you're making? The point is that nobody was asked about whether or not these sales were known to be invalid sales, and sales that were potentially invalidating the patent, whether or not these sales had anything other than experimental purposes, and whether anyone at Sigma Farm, Gilead, knew, in fact, that this was something that was supposed to be disposed of in the patent office, or that was materially withheld. Their 102B argument really focuses on the fact that they argue, and it's at page 8, I think, of their motion for attorney's fees at the district court level, but it basically says that Gilead knew that this patent was invalid because it knew these sales had taken place and that they were commercial sales and therefore invalidating. There's no evidence whatsoever. This memo is evidence of a potential of knowing that these sales had occurred. I mean, obviously, the purchase was made. Right. Right? The purchase was made, and the product was used, as Mr. Rosenquist admitted, for commercial purposes. This memorandum shows that the purchase was made before the on-sale bar date. Yes. So if you have a non-sale bar purchase or a sale, and the prosecutors know that as they're prosecuting the patent, shouldn't there be a presumption that you have to bring that before the PTO given the fact that it has a potential of negating the issuance of the patent? Not when the sale was clearly for testing purposes. I mean, as Mr. Rosenquist explained, Gilead couldn't make this product. It was having it made for purposes of experimental use. It was clinical research that was being done. But if you withhold that information, you're doing it based on your belief that you've met the legal test. Yes, but there's also no... So you're answering a legal question. I mean, you're making a strategic decision. I'm not going to disclose this information because I think I'm legally in a good place. Sure. If, in fact, they had deposed the prosecuting attorneys and asked the prosecuting attorneys, did you know about this? Did you make this legal decision? What was your basis for this legal decision? Or, in fact, did you withhold it because you were trying to get the patent issued? Then there may be some evidence that there was some nefarious intent involved here. But there is no such evidence. There was no deposing of the inventors. There was deposing of one inventor, and he wasn't asked about this, the sales or whether they were material or whether they should have been disclosed to the patent office. There was no depositions of the prosecuting attorneys. There was one deposition of a 30B6 witness who was supposed to speak on behalf of the prosecution. There was no questions asked about this issue. This was never raised. If there's evidence of... of a non-sale bar event, and it's not controverted, the parties acknowledge that this happened, why isn't that material evidence that should have been disclosed to the PTO? If the belief was it was all experimental use, why, if it's an on-sale bar, it goes to that requirement, why shouldn't that be disclosed to the PTO and the explanation given to the PTO? We did have this sale prior to... prior to the on-sale bar date, and it was all for experimental use. Here's the evidence. Here's what we did with it, et cetera. Well, Your Honor, I don't... I can't say why it wasn't done at the time. I do know that there's no evidence under, for example, Therosense, to say that there was some sort of material attempt to withhold this from the patent office or even to say that it was known to be material. In fact, from the perspective of Gilead, because it was experimental use, under the FAF case, it's negated. The whole point is that this is commercial sale for the purposes of... primarily for the purposes of experimentation, and that should not even get up to the point of having to worry about whether or not this was an invalidated sale. If you have an uncontroverted on-bar sale, why shouldn't that be, per se, material for purposes of Therosense? Well, again, it is material. It goes to the very heart of a patent. It can kill the patent, whereas the failure to disclose a prior reference may not kill the patent. You can argue about that. But the on-sale bar, I mean, that... that could kill the patent. That's got to be material, don't you think? Well, it has to be material if it's understood by somebody to be material. Whether or not, again, if there was testimony that said they knew this was material, again, the point here, Your Honor, is that Gilead is trying to... I mean, Sigma Farm is trying to make this case an exceptional case. And in order to do that, it's got to show that this somehow stood out. All right? And the fact that there was some question as to whether or not this was a commercial sale or not, I don't think makes this case stand out. I mean, I think you have to look at the whole case here. And at the issue that's presented here. All right? The issue that's presented here is whether or not this case, as a whole, as Judge Dyke said when he was sitting in Texas in the Stratton case, whether this case as a whole is exceptional. And I don't think we've gotten that at all from Sigma Farm. And, in fact, I don't think the judge's opinion at the district court level is a problem, even though the change... I mean, even though that the Brooks furniture case has been... You know, the standard has been put aside. I don't think we have an issue because I think what we've got here is a situation where the judge... And, you know, I can quote from her opinion. I mean, Sigma Farm has failed to establish any misconduct on the part of Gilead during the litigation or in the procurement of its patents or that the litigation was objectively baseless and brought in subjective bad faith. That, I think, satisfies either standard. The latter part of that statement you just quoted is the Brooks furniture test the Supreme Court... Correct. So I understand where you're coming from, but my question really is the same I asked your friend is, why shouldn't we send this back to the district court to apply the standard? It seems like the Supreme Court made it pretty clear that given the district court's familiarity with cases and the fact that it was creating a new standard, it was the district court's role to do this. And it seems like you're asking us to kind of look at it and, based upon factual findings made under the old standard, kind of give it an eyeball test and say, well, so it failed under the new standard. Well, again, I think, Your Honor, the point is that the district court under Highmark has the discretion. And the district court did go through the facts and did reach a conclusion. Now... If the district court is exercising discretion, you've got a problem because the district court then should be exercising discretion under the new standard, whereas it seems as though your opponents are arguing that there's only one ground for the award of attorney's fees here, and that's objective baselessness, which still survives as part of the test, though it's not a complete answer anymore. And if they only have that one argument and if we reject that, what is there for the district court to do? Well, again, I think, Your Honor, my point is, as we point out at page 18 of our brief, the district court, despite citing Brooks, as it had to at the time, really did answer the questions posed by Optic. In concluding that Gilead had both a subjective and objective good faith basis for maintaining its claims against Sigma Pharma, the district court found Gilead's defense of the 340 patent not to be substantively weak, and that Gilead had not acted unreasonably in litigating the patent. And this is the same situation that Judge Bryson was faced with in the Bianco-Globus medical case when he was sitting in the Eastern District of Texas. And his conclusion in denying the request for reconsideration after the Supreme Court's decision in Octane was that this court's finding that neither part of the prior test, the Brooks test, was satisfied, thus largely answers the question whether this case is exceptional under the Supreme Court's new test. And under this consolidated aluminum case that we cite in our papers, this court can, in fact, look at it and say, essentially, that, yes, the standard has changed, but the district court did get it right anyway. So, yes, there is case law to support that from the Federal Circuit. And I think the other thing that's important to keep in mind here, Your Honors, is that although Gilead of Signal Farm wants to focus this case on the 102B argument, there's more to it than that. And one of the things that's important to keep in mind, and it follows in connection with Your Honor, Judge Sykes' strategy decision, is, as I said before, the totality of the circumstances here and whether or not this is one of those rare and unusual cases. What we have to keep in mind is there were two patents that served in this case, the 159 patent and the 34L. Now, Signal Farm has not appealed the 159 patent and the decision of the district court in the 159 patent not to grant attorney's fees and define the case, essentially, not exceptional with respect to the 159 patent. And I would submit, Your Honors, that their failure to appeal that, one, essentially, concedes that the district court was correct, but I think it tries to take the focus away from that portion of the case where the court actually found that Gilead was correct and Signal Farm would like to have this court not focus on that whatsoever by not appealing it. But I think as part of the totality of the circumstances that the district court actually did, in fact, consider, we have to not leave that out. So, going back for a second to my colleague's request about the depositions. I mean, he had talked about having to depose the president of the company, the CEO of the company. There was discussion about that and we at Gilead objected to that. The CEO had other things going on. However, our point was there are, as expected in this memo, 46 other people, 45 other people you could depose first. And we never said that they could not have them forever. What we said was take the people that are more relevant and if, in fact, you get to the end of the day and you still need to have this person, then we'll reconsider it. And the judge agreed with that. So, it's not as though... Did they appeal the failure to get more discovery? No, and they have not... Then what are we talking about? My colleague brought it up. Your Honor, they also have not appealed the fact that the district court dismissed this case with prejudice, including the 102B claims and the invalidity and the inequitable conduct claims that Sigma Farm raised below. Dismissed with prejudice. So, at one level, I think the district court didn't even necessarily need to get to this issue. But I think the fact that she did get to the 102B arguments and did talk about the fact that Gilead had no... There was no intent to withhold this material from the patent office. I think the fact that she did get into that issue, which is important because I think it does show that she was addressing more than just the Brooks Furniture case, but the overall totality of the circumstances that was going on in this particular case. And she dismissed this claim with prejudice. There was no appeal from that. So, in fact, that patent and the 102B claim is out of the case. There really is no need, even if it were to send the case, send it back to the district court and she would take further discovery on this and find, at the end of the day, that this patent wasn't valid. It's irrelevant because, one, Sigma Farm has already gotten a covenant not to sue with respect to this patent, and they're actually manufacturing their product and there's no one else on the market that is somebody that Gilead is going to go after with respect to this patent. It would really be an advisory opinion. At that point, if we had to look further at... Advisory opinion about legal fees? No, no, no. Well, that's my point, Your Honor. The issue is the legal fees and whether this case is exceptional. But that's the issue. But Sigma Farm wants to take this back to take more discovery on whether or not Gilead knew that there was a material withholding from the patent office. And, again, at the end of the day, it doesn't... They didn't ask for the discovery. That's not on appeal. I understand, but Judge Hughes said if we send this back, what are we going to do? And he, Mr. Rosenquist, said he wants to send it back to take further discovery. I'm saying that's completely... It's useless and it would do no good. He didn't raise it. Well, he raised it this morning. He didn't raise it in his briefs. That's true. No, you've got to raise it in your briefs. So, to summarize, Your Honor, the district court, Your Honors, the district court concluded that Sigma Farm had failed to establish any evidence of litigation or prosecution misconduct. Sigma Farm has failed to show that Gilead knew the 340 patent to be invalid. Sigma Farm's claims as to invalidity and equitable conduct have been dismissed with prejudice and there was no appeal. Sigma Farm conceded that the district court was correct in denying attorney's fees claim as to the other patent here by not appealing it. And the sales, as Mr. Rosenquist admitted, were clearly for experimentation. Okay. Thank you, Your Honor. Thank you, Mr. Chairman. Thank you, Your Honors. Mr. Rosenquist, you've got about 4 minutes. I'll be fairly short. With respect to the issue of discovery, as I said before, during the course of this litigation, below in the district court, Sigma Farm did not have the ability to take discovery with respect to... Did you argue in your brief that we should remand it so you could get more discovery? I'm saying that that's a possibility. Did you argue that? What I'm saying is... Did you argue that in your brief? Yes, we did. Where? In the very beginning where we talk about... Can you show me where you argued that? Well, actually, Your Honor, we did not argue that in our brief. What we pointed out, Your Honor, was that we did not have discovery of Dr. Martin. That Dr. Martin would be the person you would take if you were trying to show that Gilead had knowledge of, as Judge Reina said, a possible on sale. Did you ask for that discovery in connection with attorney's fees of the district court? No, Your Honor. How is that issue possibly before us? You didn't ask for it in connection with attorney's fees, and you didn't even put it in your brief. All right. Here's what I want to clarify. In response to your answer to my question last time, is your argument for attorney's fees that their litigation was objectively baseless? With respect to the 340 patents. And the other stuff you haven't appealed properly? We didn't appeal it. That's correct. So, whether their litigation is objectively baseless is a question of law, correct? That's correct. So, you agree then... I just want to make clear because I... Certainly. I want to assert the district court's responsibility, but you agree that we can determine right now whether their conduct was objectively baseless or not? Yes, you can. Okay. If we were to send this back down for an exceptional finding under Octane, would the district court have the authority to require more discovery or to permit more discovery in order to make an exceptional finding? My understanding is that a motion for attorney's fees is based on the federal question rather than the original lawsuit. So, I think that you could take additional discovery. Okay. Anything further? The only thing further is, again, Your Honor, as we did in our letter, we'd like to apologize for any difficulties that our redaction of Gilead's confidential information caused this court. Thank you. Okay. Thank you, Mr. Rocha. Thank you, Mr. Kelly. Thank both counsel. The case is submitted.